IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

RICO SUN TOURS, INC.

     Plaintiff,

     v.

EDGARD CAPELES VARGAS;
RICARDO SERRA CASTILLO;
RICARDO RIVAS TORRES;
GERMÁN VÁZQUEZ;
WILLIAM TORRES RODRIGUEZ;
SAN JUAN HAPPY TOURS, CORP;
UNITED TOUR GUIDES COOP OF
PUERTO RICO;
UNIÓN DE TRANSPORTISTAS Y
RAMAS ANEXAS, INC.

     Defendants.

CIVIL NO. 14-

## COMPLAINT

Rico Sun Tours, Inc. ("RST") for its complaint against defendants very respectfully states and prays:

### I.    INTRODUCTION AND NATURE OF THE ACTION:

1.    This action challenges Defendants' illegal conduct that eliminated and prevented competition in the cruise ship passenger industry in violation of Section 1 of the Sherman Act. The Defendants have avoided competing with one another by allocating the San Juan port market among them. Defendants accomplished this division of the San Juan port market through threats of causing economic, physical and property harm to RST and to others who wished to work with RST. As a result, the San Juan

Complaint
Civil No. 14-
Page 2

port market is dominated solely by Defendants with no effective competition. A third entity, by the name of Tour Coop de Puerto Rico, competes in the San Juan port market and provides offshore excursions and tours to cruise ship passengers. Although Tour Coop de Puerto Rico was not involved in the conspiracy and exclusionary conduct that is the subject of this Complaint, in the past Tour Coop de Puerto Rico has engaged in similar exclusionary conduct. Upon information and belief, Tour Coop de Puerto Rico participated in the exclusion of Caribbean Tours and Travel from the San Juan port market that occurred on November 3, 2004.

2.    This conduct has allowed Defendants to acquire and maintain a monopoly in the San Juan port market, engage in anticompetitive conduct, and charge supra-competitive prices. In addition, such monopoly has limited the choice of offshore excursions and tours available to cruise ship passengers to only Defendants United Tour Guides Coop of Puerto Rico and San Juan Happy Tours, Corp. Further, Defendant Unión de Transportistas y Ramas Anexas has served as the hub of the Defendants' perpetual conspiracy to maintain, through violence and threats, RST out of the San Juan port market.

3.    Defendants have also engaged in conduct that constitutes unlawful monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Defendants have willfully acquired or maintained monopoly power over the offshore excursions and tours

Complaint
Civil No. 14-
Page 3

product market within the San Juan port market.  Defendants' willful acquisition or
maintenance of monopoly power is the result of exclusionary, anticompetitive
conduct, including without limitation: (i) conspiring and entering into and
implementing an illegal agreement to keep RST and other competitors out of the San
Juan port market by allocating such market between San Juan Happy Tours, Corp.
and United Tour Guides Coop of Puerto Rico; and (ii) substantially interfering with
Operators who wished to work with RST in the San Juan port market. Through such
unlawful conduct, Defendants have excluded actual and potential competitors, such as
RST, from the relevant geographic market.  Because of Defendants' unlawful
conduct, cruise ship passengers have been forced to pay higher prices and have been
offered limited choices of offshore excursions and tours.

4.     Accordingly, RST brings this action against Defendants for violations of Sections 1
and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and applicable Puerto Rico law,
seeking an injunction, treble damages and other relief against Defendants.

## II. JURISDICTION AND VENUE:

5.     This Honorable Court has original federal question jurisdiction pursuant to 15 U.S.C.
§ 15 and 28 U.S.C. §§ 1331, 1337 and 1338 as this case involves substantive claims
arising under the Sherman Act, 15 U.S.C. §§ 1-7, *et seq*. The Court has supplemental
jurisdiction over the Puerto Rico law claims pursuant to 28 U.S.C. §1367(a).

Complaint
Civil No. 14-
Page 4

6.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b) and (c) and 15 U.S.C.
§ 22, given that Defendants are domiciled and doing business in the Commonwealth
of Puerto Rico and, the actions that give rise to the claims alleged in this Complaint
arose in this district.

### III. THE PARTIES:

7.    Plaintiff RST is a corporation created and organized in 1979 under the laws of the
Commonwealth of Puerto Rico. RST is duly licensed by the Puerto Rico Tourism
Company to engage in the business of offering offshore excursions and tours to guests
visiting Puerto Rico arriving in cruise ships at the San Juan port.  Additionally, RST
is also authorized to offer tours and excursions to tourists visiting Puerto Rico who
arrive by airplane. Entities engaged in RST's business are known as Operators.

8.    United Tour Guides Coop of Puerto Rico is a cooperative composed of 24
independent Operators who directly compete with RST in the same relevant
geographic market and for the same relevant product market.  United Tour Guides
Coop of Puerto Rico is a cooperative organized under the Puerto Rico General
Cooperatives Associations Act.  United Tour Guides Coop of Puerto Rico has been in
existence since 1977.

9.    San Juan Happy Tours, Corp. ("San Juan Happy Tours") is a corporation organized
under the laws of the Commonwealth of Puerto Rico, which groups 53 independent

Complaint
Civil No. 14-
Page 5

Operators who are also shareholders of the corporation, and who directly compete with RST in the same relevant geographic market and for the same relevant product market.  San Juan Happy Tours has been in existence since 2010.  San Juan Happy Tours was the entity that survived the merger between Go Happy Tours, Inc. and San Juan Tour Guides, both corporation existing since 1994 and 1985 respectively.

10.  Unión de Transportistas y Ramas Anexas, Inc. ("Unión de Transportistas y Ramas Anexas") is a labor union to which San Juan Go Happy Tours and United Tour Guides Coop of Puerto Rico are affiliated.  Unión de Transportistas y Ramas Anexas has been in existence since 2012, and was created by Defendant Germán Vázquez, former Teamster (Tronquista) leader.

11.  The individual Defendants utilized San Juan Happy Tours, United Tour Guides Coop of Puerto Rico and Unión de Transportistas y Ramas Anexas as their conduits through which they carried out the illegal conspiracy and horizontal boycott to harm RST and the relevant market.

12.  Although these 77 operators are affiliated with United Tour Guides Coop of Puerto Rico and San Juan Happy Tours, most of them are independent in the sense that they own and maintain their own vehicles. Further, the majority of these Operators hold individual franchises from the Puerto Rico Tourism Company authorizing each to serve as an Operator and compete with RST in the same relevant geographical market

Complaint
Civil No. 14-
Page 6

and for the same relevant product market.

13.   Germán Vázquez has acted as the president of Unión de Transportistas y Ramas Anexas since 2012.  However, Defendant Vázquez is not an authorized Operator.

14.   William Torres Rodríguez has acted as the president of San Juan Happy Tours since 2010. He is an authorized Operator who directly competes with RST in the same relevant geographic market and for the same relevant product market.  Defendant Torres has been involved in the cruise ship passenger industry for many years.

15.   Edgard Capeles Vargas has acted as the vice president of San Juan Happy Tours since 2012. He is an authorized Operator who directly competes with RST in the same relevant geographic market and for the same relevant product market.  Defendant Capeles has been involved in the cruise ship passenger industry for many years.,

16.   Ricardo Serra Castillo is an authorized Operator who directly competes with RST in the same relevant geographic market and for the same relevant product market. Defendant Serra is the General Manager and shareholder of United Tour Guides Coop of Puerto Rico. Defendant Serra has been involved in the cruise ship passenger industry for many years.

17.   Ricardo Rivas Torres is an authorized Operator who directly competes with RST in the same relevant geographic market and for the same relevant product market. Defendant Rivas is a shareholder of United Tour Guides Coop of Puerto Rico.

Complaint
Civil No. 14-
Page 7

Defendant Rivas has been involved in the cruise ship passenger industry for many years.

18.   The actions complained of herein have restrained and adversely affected interstate commerce because the parties offer their services and are paid for such services across state lines. Further, the parties all purchase goods and supplies in interstate commerce.

## IV. THE CRUISE SHIP PASSENGER MARKET AND ITS IMPORTANCE TO THE PUERTO RICO ECONOMY:

19.   In April 2006, Puerto Rico entered a period of recession that has continued until today.   Puerto Rico's economy is facing structural problems associated to the weakening of its productive base.

20.   The main causes of Puerto Rico's current recession are: the end of tax benefits provided by Section 936 of the Internal Revenue Code, which affected the manufacturing sector; the contraction of the construction sector; and the banking crisis.   For the first time since "Operation Bootstrap", the local economy has faced structural and cyclical problems giving the government limited economic policy tools to manage the crisis.

21.   Unlike the present recession, during previous recessions the local government was able to implement anti-cyclical measures, such as the increase in government expenditure (public debt) in an effort to lower the effects of the economic contraction.

Complaint
Civil No. 14-
Page 8

Furthermore, stable industrial investments from multinational corporations, particularly the pharmaceutical companies, played an important role in stabilizing previous recessions.

22.   In the current situation, however, the government faces few options to stabilize and reactivate the economy. To boost economic growth, government officials are leveraging on few economic sectors that remain competitive. Two of these sectors are the tourism and the cruise ship industry, which have become key components of the reactivation strategy.

23.   The government's economic plan is focused on several industries that remain competitive, such as high tech manufacturing, the service industry, trade, and tourism. The government has placed substantial efforts to boost the economy by choosing economic sectors with growth potential. Tourism is among them.  It is an industry that is still competitive in the region and is a fundamental part of the local economy and jobs generator.

24.   According to the Puerto Rico Planning Board, the tourism industry represents 6% of the total Gross Domestic Product (GDP). As a major tourist destination, Puerto Rico is highly dependent on mainland tourists, particularly from the east coast.  After a significant decline that occurred in 2008-2009, the industry has steadily improved in recent years. Today, tourism and its related activities, such as the cruise ship

Complaint
Civil No. 14-
Page 9

component, are some of the few economic sectors that have shown a gradual recovery.

25.     The overall tourism production multiplier is 1.63.  This means that for every dollar a tourist spends here, 63 cents are injected into the economy. Moreover, the offshore excursion and tour segment has a production multiplier of 3.26. Therefore, every dollar spent by a tourist passenger generates an additional $3.26 that goes into the economy. From an economic development perspective, this multiplier effect is of utmost importance.  Industries with a high multiplier effect have a higher impact on the economy in terms of job creation, production and income. Due to this strategic role and economic potential, the government has included tourism as one of the main economic recovery drivers.

26.     Entities like the Florida-Caribbean Cruise Association commission studies to measure the adequacy of a country as a tourist destination. These studies assess multiple features of a particular destination, such as its facilities, infrastructure, personnel and attractions.   Most importantly, these studies measure the passengers' overall satisfaction.  The criterion of passenger's satisfaction is subdivided into friendliness, courtesy and safety of the destination.  In addition, the studies gauge the sufficiency, quality and variety of offshore excursions and tours. Based on these measurements, the destination receives a score or a rank.  Countries rely on this rank to design their

Complaint
Civil No. 14-
Page 10

     promotion and marketing plan in an attempt to attract new tourists and former visitors.

27.    Puerto Rico is one of the most important destinations in the Caribbean with a total cruise passenger movement of 1.2 million in 2013 alone. In fact, the Island is ranked in 7th place out of 23 cruise destinations in the Caribbean. In the first place are The Bahamas with 4.7 million, followed by Cozumel (Mexico) with 2.7 million. In third and fourth places are the US Virgin Islands and Saint Maarten with 2.0 and 1.8 million of visitors respectively. In fifth and sixth places are the Cayman Islands and Jamaica with 1.4 and 1.3 million respectively.

28.    Considering that the industries of cruise ship passenger and offshore excursions and tours are important to propel Puerto Rico's economy off the present stagnation, any negative event, such as the altercation that occurred on July 30, 2013, harms Puerto Rico's image as a tourist destination and thwarts the industry's' growth ability.

29.    The cruise ship passenger market, in which Defendants and Tour Coop de Puerto Rico compete, is highly concentrated.  There are significant barriers to market entry that prevent other Operators from rapidly and meaningfully entering and expanding- or both- in the relevant San Juan port market.

30.    For example, a new Operator must obtain a franchise from the Puerto Rico Tourism Company after demonstrating the need and convenience of a new franchise.  The

Complaint
Civil No. 14-
Page 11

existing San Juan port market Operators may oppose such new application through an administrative procedure that is not only contested, but is also expensive, burdensome and protracted.  Overall, the procedure to obtain a new franchise to enter the San Juan port market may take five years, with no guarantee that the applicant will obtain the franchise at the end of the process.

31.     Under applicable regulation, the Puerto Rico Tourism Company has the authority to freeze the consideration and concession of new franchise applications.  Moreover, this regulation allows incumbent operators (competitors of the applicant) to request the freezing of new franchises for a particular geographic region or the entire region of Puerto Rico.  Presently, the Puerto Rico Tourism Company is not considering new franchise applications for Operators wishing to enter the San Juan port market.

32.     If an Operator needs to outsource additional Operators, it must follow the order of enlistment set by the regulation. The Operator is obliged to subcontract first those Operators authorized in the geographical area where the service is needed.  If the Operators in that particular geographical area are not available, only then the Operator may subcontract Operators licensed in other geographical areas.

## V. THE RELEVANT GEOGRAPHIC MARKET AND PRODUCT MARKET:

33.     The relevant geographic market for antitrust analysis is the San Juan port where passenger cruise ships arrive.

Complaint
Civil No. 14-
Page 12

34.   The relevant product market for antitrust analysis is offshore excursions and tours offered by duly licensed Operators to the cruise ship passengers arriving at the San Juan port.

## VI. FACTUAL ALLEGATIONS:

35.   On October 12, 2012, RST and Disney Cruise Line ("Disney") entered into a Shore Excursion Services Agreement whereby RST, as a duly authorized Operator, agreed to provide offshore excursions and tours to Disney's passengers arriving at the San Juan port. The Shore Excursion Services Agreement has since been in full force and effect.

36.   RST agreed to meet and pick up Disney's passengers at the ship's gangway and return them to the ship upon completion of the chosen excursion or tour.

37.   RST agreed to offer Disney's passengers offshore excursions and activities to different destinations in Puerto Rico, such as: El Yunque Rainforest; Bacardí Rum Distillery; Old San Juan; Isla Verde Beach; Caguas' Criollo Culture Route; Hands-On Criollo Cooking Tour; Surfing Tour; and San Juan by Private Vehicle, among other tours.

38.   For the services provided by RST, and which are detailed in the Shore Excursion Services Agreement, Disney agreed to pay RST a fee based on the actual number of guests participating in each offshore excursion or tour.

Complaint
Civil No. 14-
Page 13

39.     On July 27, 2013, Disney sent an email to RST informing that its ship Disney Fantasy
        was being re-routed to San Juan due to a storm looming over the island of Saint
        Maarten.

40.     The email indicated that the Disney Fantasy was arriving on July 30, 2013.  In the
        email, Disney inquired RST about its availability to offer excursions and activities to
        Disney's passengers who wished to disembark.

41.     Upon RST's confirmed availability to offer offshore excursions and tours, 625
        passengers aboard the cruise ship signed up for different offshore tours and
        excursions upon their arrival at the San Juan port on July 30, 2013.

42.     While RST has 18 authorized vehicles with passenger capacity ranging from 4 to 49
        passengers, RST subcontracted additional vehicles from independent Operators to
        supply for the demand of Disney's 625 passengers who had booked offshore
        excursions and tours with RST.

43.     RST subcontracted Operators James López, José Fantauzzi, José Rivera, Pablo
        Rampolla, Robert Rampolla, Hermán Martínez, Yamil Maldonado, Joel Rodríguez,
        Roberto Beltrán and Yosua Caballero.  These Operators are affiliated to Defendant
        San Juan Happy Tours.

**The concoction of the illegal conspiracy and horizontal group boycott**.

44.     On July 29, 2013, co-Defendants Capeles, Vázquez and Torres exchanged through

Complaint
Civil No. 14-
Page 14

wireless devices (cellular telephones) multiple messages using the WhatsApp Messenger ("WhatsApp") application.

45. WhatsApp is an instant messaging subscription service for smartphones that uses the internet for communication. In addition to text messaging, users can also send images, video and audio media messages to one another, as well as share their location with other users using integrated mapping features.

46. Through their text message exchanges, Defendants agreed to the extent and scope of the conspiracy to prevent RST from offering its services to the Disney ship scheduled to arrive in San Juan on July 30, 2013.   Copy of the messages exchanged in Spanish and the corresponding English translation are attached as **Exhibit A**.

47. As concocted, the conspiracy consisted of impeding RST from working at the San Juan port by enjoining independent Operators, affiliated with San Juan Happy Tours, from working for RST.

48. To enforce the conspiracy, the Operators were threatened with the worst punishment possible for an independent Operator:  the burning of two shifts.

49. As the messages exchanged clearly show, the conspiracy was formed during an assembly held on the "navy frontier" on or before July 29, 2013.  At that point, the participants agreed that the purpose of the conspiracy was to prevent RST from entering and working in the San Juan port market altogether.

Complaint
Civil No. 14-
Page 15

50.   The conspirators even fashioned a boycott slogan in English, which reads as follows:

"understood, no one can work for RST until further norice (sic)".

**The conspiracy unveils**.

51.   On July 29, 2013, the day before the Disney Fantasy's arrival, Operators Yosua

Caballero and Hermán Martínez called Raymond Ortiz, RST Operations Manager, to

inform him that they were cancelling their subcontracts with RST.

52.   Yosua Caballero, James López, Yamil Maldonado and Joel Rodríguez told Ortiz that

Defendant Torres had threatened them stating that if they assisted RST with the

Disney cruise ship, San Juan Happy Tours would burn two shifts of each Operator

who disobeyed the order.

53.   In industry parlance, burning a shift means losing the turn to approach the dock to

offer the Operator's services to offshore passengers seeking excursions or tours.  For

an Operator this is disastrous because it entails being unable to work at the piers for

two full weeks.

54.   Having lost the services of the subcontracted Operators due to Defendants' threats,

RST successfully sought the services of other independent Operators not subject to

the control, direction and domination of Defendants.

55.   On July 29, 2013, Ortiz called Defendant Capeles to inquire what was happening and

the reason for the threats to the subcontracted Operators.  Defendant Capeles denied

any knowledge of the situation, which was a lie since Capeles had exchanged messages with Defendants Vázquez and Torres on WhatsApp on how to carry out the conspiracy to hurt RST.

56. Ortiz asked Defendant Capeles to tell Defendant Torres to call Ortiz. Ortiz then called Defendant Vázquez to inquire if he knew what was happening and the reason for the threats.  Defendant Vázquez replied that he had given specific orders to boycott RST and to go on strike upon the ship's arrival on July 30, 2013.  In addition, Defendant Vázquez enjoined all of San Juan Happy Tours' Operators from assisting or otherwise working with RST. Vázquez also indicated to Ortiz that he was "defending" his business.

57. Later that day, Defendant Torres, as instructed and ordered by Defendant Vázquez, called Ortiz and told him the following:

   a. That San Juan Happy Tours' Operators were not authorized to work with RST in the San Juan port;

   b. That the San Juan port belonged to United Tour Guides Coop of Puerto Rico and San Juan Happy Tours;

   c. That San Juan Happy Tours and United Tour Guides Coop of Puerto Rico will not allow any other new company to access the San Juan port;

   d. That United Tour Guides Coop of Puerto Rico and San Juan Happy Tours did

Complaint
Civil No. 14-
Page 17

    not care if their actions hurt the Puerto Rico tourism industry or if more cruise ships did not come to Puerto Rico, but that RST was never going to work again at the San Juan port.

58.    Clearly, through this conversation, Torres revealed the scope and extent of Defendants' agreement to exclude RST from working at the San Juan port and, instead, allocate the San Juan port solely between San Juan Go Happy Tours and United Tour Guides Coop of Puerto Rico.

59.    Undeterred by the threats, RST continued working on the logistics to receive the Disney Fantasy on July 30, 2013.

60.    Ortiz informed Mrs. Maritza Molina, Deputy Director of Ground Transportation of the Puerto Rico Tourism Company, about the threats RST had received.  Mrs. Molina promised to be at the docks with a group of inspectors from the Puerto Rico Tourism Company upon the ship's arrival.

**The conspiracy finally unfolds and takes place through the use of violence and criminal acts**.

61.    The Disney Fantasy docked on July 30, 2013 at the San Juan Pier 4 at 9:00 a.m.

62.    At around 9:00 a.m., Ortiz, along with RST's employees, arrived at Dock 4 to start the process of boarding the passengers who had paid for RST's excursions and tours.

63.    Defendants Vázquez, Capeles, Torres, Rivas and Serra were also present at Dock 4.

64.    With the assistance of security personnel from the Puerto Rico Ports Authority, RST

Complaint
Civil No. 14-
Page 18

parked five large capacity vehicles inside Pier 4, close to the cruise ship, to start boarding the passengers.

65.   At which point, Defendants Vázquez, Capeles, Torres, Rivas and Serra started to shout aloud that RST did not have proper permits from the Puerto Rico Tourism Company to provide offshore excursions.   However, in an attempt to appease the protestors, Mrs. Molina showed Defendant Vázquez that RST's papers were, indeed, in order.

66.   RST and Disney began the boarding process of the first 42 passengers.

67.   Suddenly, Defendant Capeles, Rivas and Torres drove their vehicles to block the exits of Dock 4.   Defendant Capeles blocked the east exit, while Rivas blocked the west and Torres blocked the center of the pier.

68.   The other RST subcontracted Operators also received threats as they were told that if they moved their vehicles, the group of protestors would break their vehicles' windows.

69.   In light of this, the Puerto Rico Police had to intervene with Defendant Capeles, who was not only inciting violence, but also encouraging other members of United Tour Guides Coop of Puerto Rico and San Juan Happy Tours to step in and join the protest. The other Defendants Serra, Torres and Rivas also shouted insults and threats. During the confrontation, Defendant Capeles was handcuffed.

Complaint
Civil No. 14-
Page 19

70. Due to Defendants' boycott, compounded by the use of violence and threats of bodily harm and damage to the Operators' vehicles, but most importantly in consideration of the passengers' safety, RST canceled the tours and excursions it had booked for the day. As a result, Disney Cruise Lines had to return the money to each passenger. RST did not obtain any revenue and did not recover the costs and expenses incurred in the organization of the excursions and tours previously booked.

71. The incident was widely reported in the media. The detrimental effect this altercation had on the image of Puerto Rico as a tourist destination received ample coverage.

72. In fact, the legislature convened a commission to investigate the incident. The Puerto Rico Association of Hotels and Tourism and the American Society of Travel Agents urged government action against those responsible for the unfortunate incident that caused damage not only to RST's property and business, but also to the Puerto Rico tourism industry as a whole. The incident portrayed Puerto Rico as a dangerous tourist destination.

73. The effect of the boycott and the disruption of RST's operations had a multiplier effect on the already weakened Puerto Rico economy. Due to this unpleasant experience, many of the 625 passengers cancelled their plans to spend the day in Puerto Rico. As such, Puerto Rico did not obtain the economic benefit it would have otherwise received had the passengers disembarked and spent the day visiting Puerto

Complaint
Civil No. 14-
Page 20

Rico.

74. The direct and indirect economic loss and negative impact to the Puerto Rico economy was estimated in $2,000,000.

75. Later that day, Defendant Capeles proudly posted on his Facebook account the following: "today I had been the problematic with several coworkers but the shop was defended as it was supposed.  Univisión, thank you for the coverage." (Translation ours).

76. Upon information and belief,  Defendants' illegal horizontal agreement and boycott, as described above, still remain in place and has not been repealed, cancelled or otherwise modified.

77. Defendants' continued agreement to restrain trade in the San Juan port market is evidenced by the absence of any new competitor, since the offering of offshore excursions and tours at the San Juan port market is –still– solely controlled by San Juan Happy Tours, United Tour Guides Coop of Puerto Rico and Tour Coop de Puerto Rico.

78. For the last 30 years, Defendants have dominated the San Juan port market. Through acts of violence and threats, they have prevented the entry of new competitors from participating in the offering of offshore excursions and tours to cruise ship passengers arriving at the San Juan port.

Complaint
Civil No. 14-
Page 21

79.   For example, Defendants have been able to suppress the following competitors who,
      for fear of reprisals, have not taken legal action to stop Defendants' monopolistic
      conduct: Santiago Ortiz d/b/a/ Turismo Internacional and Caribbean Tours and
      Travel.

**Defendants Capeles, Serra, Rivas and Vázquez were indicted, and Capeles and Vázquez face administrative sanctions**.

80.   For the actions that took place on July 30, 2013, Defendants Capeles, Vázquez, Serra
      and Rivas were charged with the crime of sabotage of essential services as codified in
      the Puerto Rico Penal Code under Article 240, 33 L.P.R.A. § 5323.

81.   The crime committed by Defendants Capeles, Rivas and Serra is defined as follows:
      "Any person who willfully destroys, damages, vandalizes, alters or discontinues the
      operation of the facilities or equipment of water service, gas, electricity, telephone,
      telecommunications, computer systems or networks or any other property intended to
      provide public or private essential services, including transportation and
      communication, shall be punished with imprisonment for a fixed term of eight (8)
      years. When the commission of the offense results in preventing a person requesting
      or receiving support for the life, health or safety, shall be punished with imprisonment
      for a fixed term of fifteen (15) years."

82.   On February 5, 2014, Defendants Serra and Rivas pled guilty to the crime of sabotage
      of essential service.   Defendants Capeles and Vázquez are awaiting trial on the

Complaint
Civil No. 14-
Page 22

charges filed against them.

83.     In addition, against Defendants Capeles and Vázquez the Puerto Rico Tourism

Company filed administrative charges stemming from their conduct and imposed each

a fine of $12,500. Further, it may cancel their Operator licenses.

**VII. CAUSES OF ACTION**:

A.
COUNT ONE:
ILLEGAL CONSPIRACY AND HORIZONTAL GROUP BOYCOTT,
IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

84.     The allegations contained in paragraphs 1 through 83 are incorporated herein by

reference.

85.     Section 1 of the Sherman Act (15 U.S.C. § 1) prohibits agreements or arrangements

that unreasonably restrain competition to the detriment of consumers.

86.     Defendants are competitors in the San Juan port market and compete for the offshore

excursions and tours product market.

87.     Between July 29 and July 30, 2013, Defendants conspired and engaged in an

agreement whereby they allocated the San Juan port market between United Tour

Guides Coop of Puerto Rico and San Juan Happy Tours to be the sole market

participants (along with Tour Coop de Puerto Rico), to provide offshore excursions

and tours to cruise ship passengers arriving at the San Juan port. The purpose of the

conspiracy and agreement was to prevent RST from entering the San Juan port market

Complaint
Civil No. 14-
Page 23

and compete in the offering of offshore excursions and tours to cruise ship passengers

arriving there.

88.   Defendants have suppressed competition in the San Juan port market by preventing

cruise ship passengers from enjoying not only lower prices, but additional excursion

and tour options, many of which Defendants United Tour Guides Coop of Puerto

Rico, San Juan Happy Tours or Tour Coop de Puerto Rico simply do not offer.

89.   This agreement constitutes a *per se* violation of Section 1 of the Sherman Act because

it is a brazenly anticompetitive horizontal agreement between competitors that

directly impacts consumers' ability to obtain lower excursion and tour prices and a

wide array of options (reduction in output).   Furthermore, this agreement is not

ancillary to any legitimate business arrangement.   Rather, it is a "naked" restraint in

violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

90.   In the alternative, Defendants' horizontal agreement violates the "Rule of Reason."

The anticompetitive consequences of Defendants' boycott, as set forth above,

outweigh any precompetitive effects that may stem from such conduct.

91.   As fully alleged above, the acts and practices of Defendants caused both antitrust

injury and injurious effects upon the Puerto Rico cruise ship passenger industry and

the Puerto Rico tourism industry as a whole.

92.   As a proximate result of Defendants' restraint on trade and the horizontal market and

Complaint
Civil No. 14-
Page 24

services allocations, RST has suffered injury and damages to its property and business

in an amount to be determined according to proof at the time of trial.

B.
COUNT TWO:
MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

93. The allegations contained in paragraphs 1 through 92 are incorporated herein by
reference.

94. Section 2 of the Sherman Act (15 U.S.C. § 2) prohibits attempts to monopolize or the
monopolization of any part of the trade or commerce.  In this case, Defendants have
monopolized the offering of offshore excursions and tours in the San Juan port market
to cruise ship passengers arriving at that port.

95. Through the exercise of their monopoly power, in a highly concentrated market,
Defendants achieved the monopolization of the delivery of offshore excursions and
tours to cruise ship passengers arriving at the San Juan port market.

96. For the last 30 years, Defendants have successfully prevented the entry of new
companies (or competitors) to provide offshore excursions and tours at the San Juan
port, lessening -or worse- destroying any meaningful competition.  Upon information
and belief, Defendants have excluded, through acts of violence and threats, the
following companies from participating in the San Juan port market: Santiago Ortiz
d/b/a/ Turismo Internacional and Caribbean Tours and Travel.

Complaint
Civil No. 14-
Page 25

97.    The exclusionary practices Defendants have engaged in to protect and enhance their
       monopoly position, consist of threats to cause harm and damage to individuals
       (Operators) and to the vehicles of such individuals.  Indeed, this is the same tactic
       Defendants utilized against RST on July 30, 2103, to prevent it from servicing the
       Disney Fantasy ship.

98.    However, in the case of RST, Defendants went a step further. Because RST did not
       yield to the threat campaign launched by Defendants in the hopes of discouraging
       RST from working at the San Juan port, Defendants brazenly and openly sabotaged
       RST's attempt to transport Disney's passengers on July 30, 2013.

99.    In fact, since 1980 no new company (or competitor) has been able to enter the San
       Juan port market to offer offshore excursions and tours to cruise ship passengers
       arriving at that port, due to Defendant's exclusionary practices and the high
       concentration existing in that particular market.

100.   The Defendants' act of monopolization produced antitrust injury and injurious effects
       upon the Puerto Rico cruise ship passenger industry and the Puerto Rico tourism
       industry as a whole.  The Defendants have suppressed the competition in the San Juan
       port market, preventing cruise ship passengers from enjoying lower prices and
       additional excursion and tour options that Defendants simply do not offer.

101.   As a proximate result of Defendants' monopolization acts, RST has suffered injury

Complaint
Civil No. 14-
Page 26

and damages to its property and business in an amount to be determined according to

proof at the time of trial.

## C.
## COUNT THREE:
## UNFAIR COMPETITION UNDER PUERTO RICO LAW

102.   The allegations contained in paragraphs 1 through 101 are incorporated herein by

reference.

103.   Based on the conduct alleged above, Defendants violated Puerto Rico law by

engaging in unfair methods of competition and unfair deceptive acts in the cruise ship

passenger industry. Defendants' practices described herein are:

   a.   Violations of statutory laws, the common law, or other established concepts of

   unfairness;

   b.   Immoral, unethical, oppressive, criminal or unscrupulous; and

   c.   Substantially injurious to competitors and Puerto Rico's tourism industry.

104.   By reason of Defendants' unfair trade practices in the cruise ship passenger industry,

RST has suffered monetary damages and loss of going concern value. RST has been

deprived of the revenue and profits it would have otherwise made but for Defendants'

illegal conduct.

## D.
## COUNT FOUR:
## PUERTO RICO NEGLIGENCE STATUTE

Complaint
Civil No. 14-
Page 27

105.  The allegations contained in paragraphs 1 through 104 are incorporated herein by reference.

106.  Art. 1802 of the Puerto Rico Civil Code, 31 L.P.R.A. § 5141 governs tort liability in Puerto Rico. Accordingly, it provides that "any person who by act or omission causes damages to another through fault or negligence shall be obligated to repair the damage so done."

107.  Defendants engaged in intentional acts that caused damages to RST, which they have a duty to redress by paying monetary compensation to RST.

108.  Defendants' actions are the proximate or adequate cause of the damages suffered by RST.

E.
COUNT FIVE:
TORTIOUS INTERFERENCE WITH CONTRACT

109.  The allegations contained in paragraphs 1 through 108 are incorporated herein by reference.

110.  RST entered into a contract with Disney to provide offshore excursions and tours to those passengers who booked with RST such excursions and tours for July 30, 2013.

111.  Defendants intentionally interfered with RST's contract with Disney by preventing RST, through acts of violence and threats, from performing its contractual obligations with Disney and the passengers who had booked offshore excursions and tours with

Complaint
Civil No. 14-
Page 28

RST.

112.  As a direct result of Defendants' tortious and intentional interference, RST's business relationship with Disney was damaged.  RST was deprived of the revenue and profits it would have otherwise made but for Defendants' illegal conduct; particularly because Disney had to return the fees to the passengers and RST did not receive any revenue and did not recover the costs and expenses incurred in organizing the excursions and tours previously booked.

113.  Defendants are, therefore, liable to RST for the damages they caused.

## VI. DEMAND FOR JURY TRIAL:

Pursuant to Fed. R. Civ. P. 38(b), RST hereby respectfully demands jury trial.

## VII. PRAYER FOR RELIEF:

RST respectfully prays for relief against Defendants, and requests the Court to issue a Judgment finding that:

1.  Defendants violated Sections 1 and 2 of the Sherman Act;

2.  As a direct result of Defendants' unlawful conduct, RST suffered actual damages and loss of going concern value that should be trebled in accordance with Section 4 of the Clayton Act (15 U.S.C. §15);

3.  RST is entitled to injunctive relief pursuant 15 U.S.C. § 26, ordering Defendants, their officers, agents, servants, employees, and attorneys and other persons who

Complaint
Civil No. 14-
Page 29

are in active concert or participation with them, to cease and desist from their horizontal group boycott and the monopolization of the relevant geographic market and product market, and from engaging in the unfair and anti-competitive conduct described herein;

4.  As a direct result of Defendants' unlawful conduct, RST is entitled to be awarded damages for Defendants' violation of the Puerto Rico laws;

5.  RST is entitled, pursuant to Section 4 of the Clayton Act (15 U.S.C. §15), to reasonable attorneys' fees and litigation costs; and

6.  RST is entitled to any other remedy the Court deems appropriate.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this 30th day of July 2014.

**CASELLAS ALCOVER & BURGOS, P.S.C.**
P.O. Box 364924
San Juan, Puerto Rico 00936-4924
Tel: (787) 756-1400
Fax: (787) 756-1401

_____/s/ César T. Alcover Acosta
CÉSAR T. ALCOVER ACOSTA,
USDC-PR 204311
Email: calcover@cabprlaw.com

_____/s/ Sarika J. Angulo Velázquez
SARIKA J. ANGULO VELAZQUEZ,
USDC-PR 230502
Email: sangulo@cabprlaw.com
